## CLAYTON et al. v. STANDARD OIL CO. OF NEW JERSEY.

### No. 612.

District Court, S. D. Texas, Houston Division.

Dec. 5, 1941.

Mandell & Wright and Herman Wright, all of Houston, Tex., for libellants.

Baker, Botts, Andrews & Wharton and Denman Moody, all of Houston, Tex., for respondent.

KENNERLY, District Judge.

This is a suit in personam by libellants against respondent to recover one-half of their wages as seamen on the Steamship "Beacon", owned and operated by respondent, on a voyage from Boston, Massachusetts, to Galveston, Texas, which wages were withheld by respondent on the ground that libellants were deserters from the ship, in that they signed on for a coastwise voyage of six months and left the ship at Galveston, Texas, after the completion of the voyage from Boston, Massachusetts, to that port.

The facts are substantially as follows:

(a)　On April 13, 1939, libellants signed Shipping Articles for a voyage of not exceeding six months on the S. S. "Beacon", owned and operated by respondent, reading as follows (signatures omitted):

"Shipping Articles.

"Articles of Agreement between Master and Seamen in the Merchant Service of the United States required by Revised Statutes of the United States Section 4520 [46 U.S.C.A. § 574].

"Port of Boston, Mass. April 13th, 1939

"It Is Agreed between the Master and Seamen, or Mariners, of the S/S 'Beacon' of Wilmington, Del. of which Ernest C. Kelson is at present Master, or whoever shall go for Master, now bound from the port of Boston, Mass. to Galveston, Texas, and such other ports and places coastwise as the Master may direct, carrying any kinds of cargo, including petroleum and/or its products in bulk or otherwise, and back to a final port of discharge in the United States, for a term of time not exceeding Six calendar months.

"It is also agreed that:

"(1)　Should any of the crew fail to join at the time specified, the Master may ship substitutes at once.

"(2)　Seamen and Firemen shall keep their respective forecastles clean, during the voyage, and shall leave them so at the termination of the voyage, under penalty of fine for each case of neglect.

"(3)　Eight hours per day shall constitute a working day while in port or at such times when regular watches are not kept.

"(4)　The oilers, wipers and coal passers shall wipe down the engines at the end of each passage, whether at anchor or in dock.

"(5)　Seamen shall keep the galley supplied with coal, and engineers' department shall supply the galley with oil.

"(6)　No liberty granted other than at the pleasure of the Master.

"(7)　No matches of any description to be brought on board by or for any member of the crew; any matches necessary will be supplied by the owners. No naked lights of any description shall be used for any purpose. Smoking is strictly prohibited on board when in port, and is only permitted at sea, and then only in such places as designated by the Master. Any member of the crew infringing the above clauses, or either of them, will be subject to fine.

"(8)　Crew to work on day of arrival in final port of discharge until 5 o'clock P. M. (if required).

"(9)　The crew under no circumstances are to bring on board liquor or other contraband articles, and if any member of the crew violates this rule, he will become personally liable and subject to any fines imposed, which will be deducted from his wages, and the liquor and other articles of contraband confiscated.

"(10) Crew to connect and disconnect cargo and bunker fuel hose whenever necessary.

"(11) Pumpman shall be signed on as pumpman and carpenter combined.

"(12) Sickness contracted by or injury suffered by any member of the ship's personnel should be reported immediately to the Master or the officer on duty so that medical treatment can be rendered and proper notations thereof entered in the official log of the vessel."

(b) When the ship arrived at Galveston, Texas, libellants demanded one-half of their wages, which was paid to them, and afterwards on April 24, 1939, left the ship. They were on that date logged by the master as deserters.

(c) Before leaving the ship, they delivered, or caused to be delivered, to the master a written statement, as follows:

"To the Master of the SS Beacon:

"Dear Sir: We, the unlicensed members of the crew of the SS Beacon respectfully ask you to pay us all wages we have earned and give us our discharges.

"As you know, there is a strike now going on and we consider it dangerous to our safety and to our future employment to continue on this ship, and in addition thereto we wish to call to your attention the general custom on the SS Beacon as well as the other Standard Oil vessels in permitting members of the crew to get off at any American port when on coastwise articles and the corresponding right of the Master to discharge any member of the crew under the same circumstances.

"Yours very truly,
"Edward H. Hughes,
"Ship's Delegate,
"S.S. Beacon."

There is no convincing evidence that any of the libellants would have been in any danger, or that their future employment would have been jeopardized, by remaining on the ship. I find that they would have been safe had they remained on the ship and their future employment would not have been jeopardized by their remaining on the ship. There is no evidence of a general custom, binding on respondent, permitting seamen to leave at any port, such as is mentioned in the statement.

(d) This case has been tried on libellants' amended libel, filed July 24, 1940. In the original libel, filed April 28, 1939, no reason is stated why libellants left the ship at Galveston, but in the amended libel, libellants claim that at the time the Shipping Articles were executed, there was in effect an agreement for the benefit of the unlicensed personnel on respondent's ships, and including libellants, between the National Maritime Union, of which libellants are members, and respondent, dated April 1, 1938, which became a part of the Shipping Articles. They claim that this agreement expired during the voyage from Boston to Galveston, and that they were justified in leaving the ship at Galveston, the first port reached after the expiration of such agreement. There is nothing in the Shipping Articles which refers to the agreement, but I think that, taking the record as a whole, it appears, and I find, that it was intended to make the agreement a part of the Shipping Articles. The agreement is dated April 1, 1938, and on its face expires April 1, 1939, and is quoted in the margin.[1]

Before April 1, 1939, negotiations were begun between the Union and respondent for its renewal, but far-reaching changes were desired by the Union. By mutual

---

[1] "This Agreement, made this 14th day of January, 1938, by and between the Standard Oil Company of New Jersey, a corporation organized under the laws of the State of Delaware, hereinafter referred to as the Company, and the unlicensed personnel employed on the American flag seagoing vessels manned by the Company, hereinafter referred to as the unlicensed personnel or employees, represented by the National Maritime Union, and the National Maritime Union, hereinafter referred to as the Union, witnesseth:

"Whereas it is the desire of the Union and the Company to enter into an agreement which will prevent strikes and lockouts and insure peaceful adjustment

and settlement of all grievances, disputes and differences which may arise between the Company and its employees, prevent stoppage of work, and tend to stabilize and strengthen the shipping industry, and to establish wage scales and working conditions which will prevail between the parties hereto during the existence of this Agreement:

"Now, therefore, it is hereby agreed between the parties as follows:

"General Provisions for all divisions of the Union

"Article 1

"Section 1. The Company in entering into this Agreement hereby recognizes the Union as the agency for collective

agreement, it was continued in force, pending such negotiations. On April 13, 1939, the Union terminated the agreement as of date April 17, 1939. During all the negotiations for renewal, respondent was willing to renew the agreement, the disagreement which brought about its termination being with respect to the changes desired by the Union. When respondent was advised of the termination of the agreement, it gave notice to the unlicensed personnel on its ships of its willingness to continue the agreement in effect. The pertinent part of such notice being as follows:—

"We want every man on our ships to know why we have been unable to make a

bargaining for the unlicensed personnel who are members in good standing of the Union employed on board the Company's vessels during period National Labor Relations Board elections are being held.

"The Company agrees that it will recognize the Union as the collective bargaining agency for its unlicensed personnel, as, if and when the Union is certified by the National Labor Relations Board as having a majority of the unlicensed personnel employed by the Company.

"Section 2. This document shall constitute a provisional agreement between the Company and the Union for its members effective for one year from April 1, 1938, upon ratification by the unlicensed personnel aboard vessels for the Company as hereinafter provided.

"If, as, and when the Union has been certified by the National Labor Relations Board as the collective bargaining agency for all unlicensed personnel aboard the Company's vessels, this provisional agreement shall automatically become the agreement between the Company and the Union as bargaining agent for all of such employees for the remaining part of the period of one year from April 1, 1938, or for such part of said period as the Union shall continue to represent a majority of the unlicensed personnel on board its vessels, providing ratification of the provisional agreement by the unlicensed personnel aboard vessels has already taken place. If ratification has not taken place at the time of certification by the Labor Board, the agreement will be effective after ratification for the period of one year from April 1, 1938.

"Thereafter this agreement shall continue from year to year unless written notice to terminate or modify is filed by either party thirty days prior to expiration on April 1 of any one year period. Without limiting the foregoing sentence of this paragraph such renewed agreement shall continue for such part of any subsequent year following April 1, 1939 as the Union shall continue to represent a majority of the unlicensed personnel aboard the Company's vessels.

"Ratification of the agreement by the unlicensed personnel aboard vessels of the Company shall be determined by a secret ballot to be conducted jointly by the Company and the Union. Ratification shall be deemed to have taken place when and if 51% of those eligible to vote have been counted as in favor thereof.

"Section 3. The Company shall permit, by the distribution of passes, the authorized representatives of the Union to board the Company's vessels for the purpose of consulting with the unlicensed personnel employed thereon, provided, however, the Union's patrolmen shall neither violate any provision of this Agreement nor interfere with or retard the work of the vessel subject to penalty of revocation of the license granted herewith. Insofar as possible the work of the Union's patrolmen on board the vessel shall be accomplished within two hours.

"The Union shall take out insurance which will protect the Company and/or its agent, charterer, operator, and subsidiary or affiliated companies from any claim, loss, damage or liability for loss of life or injury occurring to a representative of the Union while on the property or aboard any vessel owned, chartered or leased by any of the aforementioned parties. Evidence that such insurance protecting the Company and/or its agent, charterer, operator, and subsidiary or affiliated Companies against any and all such liability has been taken out and is in force shall be submitted to the Company's satisfaction.

"Section 4. Neither the Company nor the Union during the life of this agreement, as well as during the period of negotiation for its modification or renewal, shall instigate, encourage, or permit any strike, picketing, lockout, 'sitdown', or stoppage of work, either direct or in 'sympathy' for third parties, insofar as same may be participated in by the employees or members of the respective contracting parties. The Union will not stop, hinder, or restrain, or cause or permit its members to stop, hinder or restrain, the movement of the Company's vessels, loading or discharging cargo on same during the life of this agreement. It is understood between the contracting parties that Union members participating in any such stoppage of work shall be subject to discharge.

"Section 5. Any dispute or grievance arising in connection with the terms and

new contract with the National Maritime Union.

"Attached is a copy of the new contract which the Company offered to sign. While this was not accepted by the Union, we shall not take advantage of the expiration of the contract which you have had in the past year. Wages, hours and working conditions as described in the agreement of April 1, 1938, will continue.

"We regret that we could not reach an understanding for a renewal of this agreement, with some slight changes, nor agree on the terms proposed by the officers of the Union. In an effort to arrive at an understanding we have held conferences with provisions of this agreement shall be settled according to the following procedure:

"The unlicensed personnel of each department employed on board vessels operated by the Company should, by secret ballot, elect a representative. However, licensed officers or department heads shall not be eligible for election. One representative shall be elected by and from the Deck Department, one representative elected by and from the Engine Department, and one representative elected by and from the Stewards' Department. Such three representatives shall constitute the ship committee and be the Union representatives aboard the vessel. Any employee who feels that he has been unjustly treated, or has been subjected to an unfair consideration, shall endeavor to have said grievance adjusted either in person or through his respective elected representative in the following order:

"First: Presentation of the complaint to his immediate superior;

"Second: Appeal to the head of the department in which the employee involved shall be employed;

"Third: Appeal to the Master of the ship or a committee composed of the three elected representatives and not more than an equal number of representatives consisting of the officers or department heads appointed by the Master of the vessel:

"Fourth: Appeal directly to the Master.

"In the event that any such grievance cannot be amicably and promptly. settled by resort to the above successive hearings, an appeal may be made to the management's representative in port either directly or together with the Union's shore representatives. However, no case shall be reviewed by either the management's representative in port or by the Union's representative in port until it has been reviewed through the procedure outlined above.

"If such controversy shall not have been adjusted in the above manner all the facts in the case shall be reduced to writing before the departure of the vessel and submitted in writing to the New York Port Committee composed of three representatives appointed by the Union and three representatives appointed by the Company.

"Appeal, if then necessary, shall be in writing to the authorized representative of the Union and the Manager of the Marine Department or the President of the Company.

"Section 6. If any controversy or grievance arising under the terms of this agreement is not amicably adjusted and settled in the manner hereinbefore provided, same may be submitted to a board of arbitration, under conditions to be mutually agreed upon at that time, selected as follows:

"Three (3). to be chosen by the Company and three (3) to be chosen by the Union. These six members shall meet within forty-eight (48) hours after receipt of written notification from either party (Saturdays, Sundays and holidays excluded) and at that meeting shall select a seventh member. If they cannot agree on the seventh member, he shall be designated by the American Arbitration Association. The decision of the Board shall be rendered within seventy-two (72) hours unless by agreement time is extended by seventy-two (72) hour periods. The decision of a majority of said Board shall be final and binding on both the Company and the Union in such controversy or grievance and shall conclusively determine the same. The Company and the Union shall bear the expenses of their respective appointees but shall share equally the expenses of the seventh member.

"Under no circumstances shall there be a cessation of work, strike of any nature, or lockout while arbitration or adjustment of the dispute is in process of being settled as herein agreed upon.

"Section 7. The Company and the Union agree, each in its own behalf that there shall be no discrimination, intimidation, or coercion against any employee on board the Company's vessels because of membership or non-membership in any labor organization. Any employee who violates this provision shall be subject to discharge. However, such action by an individual shall not abrogate this agreement.

"Section 8. No member of the Union employed on any vessel operated by the

Union representatives almost daily since March 8. These ended on April 13 when the Union officials terminated the discussions," etc.

\* \* \* \* \*

"At no time did the Company break off negotiations. They were ended by the representatives of the Union on April 13, because the Company would not agree to the Union's hiring hall and closed shop demand. The Company again stated its willingness to continue discussion of the other provisions of the proposed agreement and made it clear that the wages,

Company shall be required to subscribe to, or become a member of, any benefit society, club, or any organization instituted or sponsored by the Company. In the event that any employee is now a member of such benefit, society, club or organization, he may terminate his membership therein at any time and such termination shall not act prejudicially against his present or possible future employment with the Company.

"Section 9. The unlicensed personnel shall submit to and undergo such medical examinations as are or may be required by the Company from time to time and the Company shall retain the right to reject such unlicensed personnel as may be determined by the Company's medical examiners to be unfit for employment in keeping with the Company's rules and regulations. The Company agrees to review carefully any case which the medical examiners of the Union certify to be free from communicable disease and disabling defects and to be able to do the work applied for by the applicant, and if a review fails to establish the facts to the mutual satisfaction of the Company's and Union's medical examiners concerned, the examiners of the Company and of the Union will agree upon a suitable outside doctor whose independent judgment will be determining on the facts at issue. The expense of the outside consultant will be borne equally by the Company and the Union.

"Section 10. Members of the Union while employed on board vessels of the Company agree to comply with all lawful orders of their superior officers and division heads and with all Company rules not inconsistent with the terms and provisions of this agreement. Recognizing the necessity for discipline on board Company vessels and at the same time in order to protect an employee against losing his job unfairly, the Company agrees to post on the bulletin board of each vessel a list of rules which shall constitute cause for which members of the unlicensed personnel may be discharged without further notice.

"For other offenses not on the posted list, members of the unlicensed personnel shall not be discharged without first having been notified in writing that a repetition of the offense will make him liable to dismissal. In the event that the mem-

bers of the Union feel that any of the rules or regulations promulgated by the Company are inconsistent with the terms of this agreement, such members agree to make proper and orderly representation as outlined under the grievance machinery of Section 5.

"Section 11. The Company shall comply with such laws and regulations as the Secretary of Commerce shall issue through the Bureau of Marine Inspection and Navigation as to all matters relating to manning, quarters and equipment and construction and arrangement of the ship.

"Section 12. Wherever practicable life boat and other emergency drills shall be held on week days between the hours of 8 A.M. and 4:30 P.M. and on Saturdays between the hours of 8 A.M. and 12:00 Noon.

"Section 13. The Company shall furnish safe gear and working equipment and make every effort to provide safe working conditions at all times.

"Section 14: The unlicensed personnel either on or off watch shall be paid at double the overtime rate in addition to their regular wages as compensation for handling dynamite, caps, gun powder, and blasting powder.

"Section 15. In those out-ports where there are no regular longshoremen available, members of the crew may be allowed to drive winches for handling cargo or handle cargo and for such work they shall be paid, in addition to their regular monthly wage, the overtime rate. This Section shall not be so construed as to be applicable to any work where longshoremen are not available due to labor trouble.

"Section 16. No workaway shall be carried except for the sole purpose of providing transportation and, in such case, shall be in addition to the regular crew.

"Section 17. When additional certified men are hired for temporary day work on board vessels in port to assist the regular members of the crew on the work ordinarily performed by them, the rate of pay shall be $6 per eight hour day with a minimum of one-half day's pay in any one day.

"Section 18. If, due to illness or other reasons, a member of the unlicensed personnel is assigned to another rating

hours and working conditions as contained in the agreement of April 1, 1938 will be continued for the benefit of its employees."

(e) I find that the libellants left the ship because of the pendency of a strike, and for no other reason.

(f) The amount of the unpaid wages of each libellant is undisputed and is shown by the compilation attached to an affidavit of the master, dated September 20, 1939. It has been stipulated as follows: "It is further agreed and stipulated by the par-

---

higher than his own, he shall receive the higher rate of pay during such assignment but there shall be no reduction in his regular rate provided such employee takes a job of lower rating, and his customary hours shall then become the hours of the new assignment.

"Section 19. When members of the unlicensed personnel in the Stewards' Department are required to do extra work because a vessel sailed 'short-handed', the wages of the absent employee shall be divided among the employees who performed his work. When members of the unlicensed personnel in the Deck and Engine Departments are required to work in addition to their regular watches because a vessel sails 'short-handed', they shall be paid for the extra time at the overtime rate.

"Section 20. After one year of continuous service from April 1, 1938 every unlicensed member of the crew shall be entitled to an annual vacation of twenty-one days with pay.

"If an employee has six months continuous service, he may be granted a vacation of not more than ten days with pay, but such period will be deducted from the twenty-one days.

"While the individual's wishes will be considered wherever possible, vacations can only be granted at such times and places as do not interfere with the operating necessities of the service. (Vacations shall be cumulative to the extent mutually agreed upon between the individual and the Company).

"Continuous service shall not be deemed to be broken by leaves of absence on account of illness, accident, vacation, layoffs for lack of work, or leaves of absence for valid reasons from the service of the Company, provided however, that no vacation shall accrue during such periods of furlough.

"If, after six months' continuous service, an employee is terminated for any reason, he will be entitled to receive in addition to his regular pay, one week's pay as a vacation allowance at time of termination. No other cash allowance in lieu of vacations shall be made. Any employee discharged for cause has the right of appeal under the grievance procedure provided in Article 1, Section 5.

"If an employee is terminated for any reason with less than six months' con-

tinuous service, no vacation pay will be allowed.

"Section 21. The Company agrees not to discriminate against any employee for Union activities which are not inconsistent with the provisions of this agreement. The Union, in turn, agrees that Union activities entered into by its members will not be permitted to interfere with the proper working of the vessel.

"Section 22. Members of the unlicensed personnel may remain continually in employment on the same vessel provided that both the Company and the member desire such employment to continue.

"Section 23. All vessels of the Company when leaving port must have deck cargo when carried properly secured before arriving at the sea buoy.

"Section 24. If at any future date members of the unlicensed personnel of the Company are requested to provide their own uniforms, it is agreed that at such time the parties hereto shall meet and adjust same on the basis of additional compensation.

"Article 11
"Port Time

"Section 1. Port time shall be defined as follows:

"(a) Port time shall not commence in the case of a vessel anchoring because of fog or other impediments to navigation, awaiting tides, or berth, or waiting at quarantine to proceed to dock.

"(b) When a vessel anchors for the purpose of loading or discharging cargo, port time shall commence when this operation begins.

"(c) When the loading or discharging operation ceases for the purpose of moving vessel to another berth, dock or inland port, port time shall cease, provided, however, the period of moving vessel exceeds three hours.

"(d) Port time shall also be deemed to commence when vessel is securely moored to the dock.

"Section 2. When a vessel moors at dock or drops anchor for the purpose of loading or discharging cargo, or tank-cleaning, sea watches may be continued at the option of the Master.

"Article 111
"Overtime

"Section 1. Overtime shall in no case be worked without the prior authoriza-

ties herein, acting by and through their undersigned Proctors of Record, that, as a direct and proximate result of the departure from the service of the SS 'Beacon' by libellants herein during the latter part of April, 1939, and their failure and refusal to continue in the services of the ship from and after that time, respondent, Standard Oil Company of New Jersey, reasonably incurred expenses in hiring substitute seamen for the Libellants which would equal or exceed the amount of

tion of the master or person acting by authority of the Master.

"Section 2. Any and all work performed during port time, as defined in Article 11, on Saturday afternoons, Sundays and holidays shall be considered overtime, except as specified otherwise in Departmental Working Rules.

"Section 3. Overtime shall commence at the time any employee shall be called to report for work outside of his regular schedule provided such member reports for duty within fifteen (15) minutes, otherwise overtime shall commence at the actual time such employee reports for duty and such overtime shall continue until the employee is released.

"Section 4. Where overtime worked is less than one (1) hour, overtime for one full hour shall be paid. Where the overtime worked exceeds one hour, the overtime work performed thereafter shall be paid for in one-half hour periods, a fractional part of such period to count as one-half hour.

"Section 5. When overtime is worked except as defined in Section 6, of this article the employee concerned shall sign the overtime sheet immediately on completion of the work which shall also be countersigned by the department head authorizing the work. If there is any question regarding the amount of overtime allowed, he shall at once follow the procedure outlined in Section 5, Article 1.

"Section 6. No overtime shall be paid for work in addition to the regular schedule, in connection with drills, inspections or examinations required by law, or emergency work required for the safety of the passengers, crew, vessel, cargo, or another vessel in distress. This clause shall not apply to annual inspection of the vessel.

"Section 7. All money due for approved overtime work shall be paid at the time of signing off, or in any event, not more than forty-eight (48) hours after the completion of the voyage.

"Article IV
"Holidays and General Conditions

"Section 1. The Company agrees to recognize the following as holidays: 1) New Year's day; 2) Washington's Birthday; 3) Memorial Day; 4) Independence Day; 5) Labor day; 6) Thanksgiving Day; 7) Christmas Day; 9) Armistice Day. In the event that any of the above-named holidays fall on Sunday, the following Monday shall be observed as such holiday.

"Section 2. When traveling in the course of employment from one vessel to another or from one port to another, unlicensed personnel shall be paid regular wages while en route and shall be provided with necessary transportation, and subsistence at the rate of $3.00 per day, except where subsistence is included with transportation. When traveling overnight, a berth shall be provided.

"When any employee is left ashore at any port and when such employee would ordinarily be entitled to transportation under the law, the Company shall forthwith provide transportation back to the port of signing on, and may utilize its own vessels for that purpose.

"Section 3. The following items shall be supplied to the unlicensed personnel: (1) A suitable number of clean blankets: (2) White sheets and pillow cases which shall be changed weekly: (3) Face and bath towels which shall be changed twice weekly. No clean linen or towels shall be furnished until soiled linens and towels have been returned to the steward.

"Section 4. Mattresses or pillows filled with straw or excelsior shall not be supplied.

"Section 5. All dishes provided shall be of crockery ware.

"Section 6. Suitable messrooms shall be provided separate and apart from the sleeping quarters and shall be equipped with stable chairs or benches.

"Section 7. All quarters and messrooms shall be adequately ventilated and sufficient number of fans to secure such ventilation shall be installed.

"Section 8. A sufficient number of lockers shall be installed so that each employee shall have one full length locker with sufficient space to stow a reasonable amount of gear and personal effects.

"Section 9. A recreation room separate from the sleeping quarters of the unlicensed personnel shall be provided on new vessels contracted for after the date hereof for the use of the unlicensed personnel.

"Section 10. All quarters are to be kept free from vermin insofar as possible.

"Section 11. A refrigerator shall be furnished for night lunches for the use

wages due the Libellants at the time the said Libellants left the vessel."

■ 1. Since the evidence shows, and the finding is, that libellants left the ship because of the existence of a strike, and that they would have been in no danger of any kind, nor would they have suffered loss, by remaining on board the ship, and since they had no lawful excuse for leaving the ship, they are deserters, have forfeited their wages, and may not recover here. Sections 701 and 702, Title 46 U. S.C.A. United States v. Smith, 5 Cir., 12 F.2d 265, 266. Madden et al. v. Lykes Bros. Ripley S. S. Co. (The Youngstown), 5 Cir., 110 F.2d 968, 1940 A.M.C. 363.

---

of the unlicensed personnel. Such refrigerator, if not electric, shall be adequately supplied with ice for such purpose.

"Section 12. When board and room are not furnished, unlicensed members of the crew shall receive the following allowances:

(a) in lieu of breakfast $ .60
(b) in lieu of dinner     .75
(c) in lieu of supper   _  .75
(d) in lieu of quarters _ 1.25 per night.

"Section 13. Meal hours shall be as follows:

Breakfast  _ 7:30 A.M. to  8:30 A.M.
Dinner  _ _ 11:30 A.M. to 12:30 P.M.
Supper  _ _  5:00 P.M. to  6:00 P.M.

"These hours may be varied not to exceed one hour either way.

### "Article V
### "Tank Cleaning

"Men entering tank for cleaning or actually engaged in the removal of sludge either on deck, in tanks, or in pump room bilges shall be paid the following rates:

(a) Men on watch  _ At overtime rate
(b) Men not on watch _ $1.00 per hour

"Men on watch between the hours of 6:00 A.M. and 5:00 P.M. required to shift Butterworth machines or wash down the tanks from the deck shall not receive this extra remuneration.

### "Article VI
### "Preferential Employment

"Section 1. The Company agrees that if and when the Union is certified as having a majority of the unlicensed personnel aboard Company vessels and during the period that this agreement is in effect members of the Union shall be given preference of employment at all times if said members are satisfactory to the Company to fill the respective positions, provided however, that this section shall not be construed to require the discharge of any employee who may not desire to join the Union, nor shall it apply to reshipments of former employees and particularly employees who have been absent on account of illness, accidents, vacations or leaves of absence. To protect service rights the company may transfer unlicensed personnel in its employ from one vessel to another or from one port to another.

### "Specific Departmental Working Rules
### "Article VII
### "Wage Schedule—Unlicensed Personnel
#### "Deck Department

| | | | |
|---|---|---|---|
| Ordinary Seaman | $ 65.00 | Carpenter* | $115.00 |
| A. B. Seaman | 85.00 | 1st Pumpman | 115.00 |
| Boatswain | 100.00 | 2nd Pumpman* | 95.00 |
| Quartermaster* | 87.50 | | |

#### "Engine Department

| | | | |
|---|---|---|---|
| Wiper | $ 75.00 | Storekeeper* | $ 90.00 |
| Fireman | 85.00 | Watertender* | 90.00 |
| Oiler | 90.00 | Watertender— | |
| Electrician* | 175.00 | Fireman* | 90.00 |
| Machinist* | 115.00 | | |

#### "Stewards' Department

| | | | |
|---|---|---|---|
| Chief Steward | $140.00 | P. O. and Officers' | |
| Chief Cook | 120.00 | Messman | $ 65.00 |
| 2nd Cook and | | Crew Messman | 60.00 |
| Baker | 100.00 | Galleyman* | 70.00 |
| Utility Man | 60.00 | | |

(*) When carried.

### "Article VIII
### "Deck Department Working Rules

"Section 1. The hours of work for day workers shall be eight (8) hours per day week days between 8:00 A.M. and 5:00 P.M. with an hour off for lunch and from 8:00 A.M. to 12:00 Noon on Saturday.

"Section 2. (a) At sea and in all open harbors or roadsteads, the crew shall stand regular watches as required by the Master, but no unnecessary work shall be performed on Saturday afternoon, Sundays, or holidays, or between the hours of 5:00 P.M. and 6:00 A.M. However, no chipping nor scaling shall be required between 6:00 A.M. and 8:00 A.M.

(b) On Saturday afternoons, Sundays and holidays, and between 5:00 P.M. and 6:00 A.M. at sea, the crew shall be required to do the necessary work for the safe navigation and operation of the vessel but all work distinct from these required routine duties shall be paid for at the regular overtime rate.

"Section 3. When sea watches are broken they shall be set when the vessel leaves for sea, but no later than noon on the day of departure. Docking and undocking shall be overtime for the watch below when called upon to perform this work and shall be paid for at the overtime rate.

"Section 4. Ordinary seamen shall be

2. Even if it be found and held that libellants did not leave the ship on account of a strike, they were still without lawful right to leave, and are deserters.

The Shipping Articles between libellants and respondent and the agreement between the National Maritime Union and respondent, construed together, must be regarded

required to clean the sailors' toilet, wash rooms and quarters on ship's time.

"Section 5. The carpenter, when carried, is required to standby Saturday afternoon, Sundays and holidays or between the hours of 5:00 P.M. and 8:00 A.M. such time shall be overtime.

"Section 6. The duties of the Quartermaster, when carried, at sea shall be to steer the vessel when vessel is not fitted with automatic steering gear. When vessel is fitted with automatic steering gear, he may assist in the maintenance of the wheel house and bridge deck. In port he shall stand gangway watch and assist the senior deck officer in charge.

"Section 7. The day of departure shall be the day the vessel leaves for sea from that port from which the vessel is cleared and sea watches set and maintained from the port.

"Section 8. One hour shall be allowed for battening down, rigging up, or securing general deck gear on Saturday afternoon, Sundays and holidays or between the hours of 5:00 P.M. and 6:00 A.M. by the watch without payment of overtime; provided, however, that if the work exceeds one hour during the period specified the regular overtime rate shall apply for the excess time.

"Engine Department Working Rules

"Section 1. The hours for all day workers shall be eight (8) hours per day week days from 8:00 a.m. to 5:00 P.M. with one hour off for lunch and from 8:00 A.M. to 12:00 Noon on Saturdays.

"Section 2. When an electrician is carried, he shall be responsible for the upkeep and repair, alteration and renewal and reasonable installations in connection with the vessel's electrical equipment, as directed by the engineer in charge.

"Section 3. When a machinist is carried his duties at sea and in port shall consist of assisting in the general repair, upkeep and reasonable installation of ship's machinery and equipment as directed by the engineer in charge. He shall not be required to do any painting or chipping and scaling of paint work or polishing brass work.

"Section 4. (a) Pumpmen at sea: The hours of work for pumpmen shall be from 8:00 A.M. to 12:00 Noon; from 1:00 P.M. to 5:00 P.M. week days, and from 8:00 A.M. to 12:00 Noon Saturdays. For all work performed in excess of these hours, he shall be paid at the regular overtime rate. Pumpmen's duties shall consist of handling fuel oil, ballast, cargo, and tank cleaning, equipment and all work necessary for the maintenance and operation of cargo pumps, auxiliaries, general cargo lines, and all deck machinery. He shall not be required to chip paint, scale paint, polish brass, or do any work that is not considered maintenance for the machinery under his care. He shall not be required to make heavy installations where this work is customarily done by shore gangs. This, however, shall not be construed to apply to renewals and replacements of worn out equipment.

"(b) Pumpmen in port: At the discharge port, the first pumpman's eight (8) hours are to begin with the instructions to start discharging cargo or with the instructions to stand by to discharge cargo; such time to be continuous without deducting time for meals if such time is twenty minutes or less. If carried, the second pumpman's eight (8) hours are to begin when he relieves the first pumpman. Each pumpman is to work eight (8) hours in each twenty-four (24) hours, and any additional time worked shall be considered overtime.

"Section 5. (a) Watertenders at sea: Watertenders, when carried, shall tend water and boiler auxiliaries, fuel service tanks, oil temperatures and stack drafts in fire-room and supervise firing. They shall handle any valves connected with the operation of the boilers as directed by the engineer in charge. Watertenders shall not be required to crack stops and warm up steam lines when cutting in. However, when stops have been cracked, they may be further regulated by the watertenders under the direction of the engineer in charge.

"(b) Watertenders in Port: Watertenders, when carried, in port on ships having water tube boilers shall stand watches and tend water, auxiliaries, and supervise firing. While on watch they shall not be required to perform any other duties than those herein stated. When working on day work they shall assist in the general repairs in the Engine Department as directed by the engineer in charge.

"Section 6. (a) Oilers at sea:

"1. Oilers on watch on reciprocating engines. Their work shall consist of oiling main and auxiliary machinery, the steering gear, ice machine and blowers which may be located outside engine room spaces. They are to keep handrails, gratings and floor plates wiped in the immediate vicinity of moving machinery

as the contract between libellants and respondent. An examination thereof fails to disclose any provision, permitting libel-lants to leave the ship as they did. Certainly it is true that the cancellation of the agreement by the Union, with the approval

and if water gauges and checks are in engine room they shall tend water. Oilers at sea on all vessels shall not be required to chip, scale, or wash paint, or paint, shine brass, or perform any other duties aside from the regular routine work.

"2. Oilers on watch on turbine engines: If required to tend water, their duties shall remain as outlines for reciprocating engines. When not required to tend water, oilers may be required to perform maintenance work, said maintenance work not to exceed one hour daily.

"3. Oilers on watch on motor vessels: They shall be governed by the same rules as are in effect for vessels with reciprocating engines.

"4. On all vessels when at sea the oilers on watch shall not be required to attend or operate the additional engine room machinery necessary for the functioning of the Butterworth machines in the tank cleaning operation.

"(b) Oilers in port

"1. Oilers in port on reciprocating, turbine and motor vessels if on watch at anchor or at the dock, provided they are not required to tend water, shall assist in making repairs between the hours of 6:00 A.M. and 5:00 P.M. No work outside of the routine standing of the anchor watch shall be required of the oilers between the hours of 5:00 P.M. to 6:00 A.M.

"2. When in port and watches broken, their hours shall be those of day workers and they shall assist with the repairs in Engine Department as directed by the engineer in charge.

"3. Members of the unlicensed personnel of the Engine Department on motor vessels when required to enter the casings for the purpose of cleaning or scaling shall be paid the tank-cleaning rate.

"Section 7. (a) Firemen at sea: On watch they shall tend the fires, clean burners, fuel oil strainers and keep their stations clean. They are not to go above the first grating, behind the boilers on ship's side or on ship's side abreast the boilers or below the floor plates for any cleaning or painting except to clean loose oil resulting from their work. Firemen on watch shall not be required to chip these aforementioned places. They are not to tend water unless the checks and gauges are in the fire-room in which case they may be required to tend water and shall be rated a fireman-watertender. For vessels fitted with more than three

Scotch boilers and where firemen are required to tend water, they shall not be required to clean any station with the exception of the floor plates.

"Firemen shall assist with the blowing of tubes where vessel is equipped with mechanical tube blowing apparatus. On vessels not so equipped and where tubes are blown by hand opening uptake doors and using hand lance, the fireman assisting shall be paid the tank-cleaning rate for such time as required for this duty.

"(b) Firemen in port: When watches are not broken, their duties shall be the same as at sea. When watches are broken their hours shall be the same as day workers and their duties shall consist of assisting in the general repairs and maintenance as directed by the engineer in charge. Firemen on motor vessels when not required to tend fires at sea may be required to do maintenance work on their watches, except for Saturday afternoon, Sundays and holidays. Maintenance work on night watches will consist of general cleaning but no painting or chipping will be done.

"Section 8. Firemen-Watertender (combination). When carried they shall perform the duties of firemen as defined in Section 7 and tend water at sea on vessels fitted with water tube boilers on which two boilers are used for the main engine. If more than two boilers are used for main engines, watertenders shall be carried. In port when watches are broken their duties shall be the same as those of firemen in port.

"Section 9. The storekeeper when carried, at sea or in port, shall supervise and assist the wiper in the maintenance and general work in Engine Department spaces, keep storerooms in order as directed by the engineer and assist in repair work when required.

"Section 10. Wipers, at sea and in port, shall be required to do the general cleaning and upkeep in the Engine Department spaces and assist in repair work as directed by the engineer in charge. When cleaning fuel oil and domestic fresh water tanks they shall receive the regular tank-cleaning rate. Wiper shall also keep the wipers' and firemen's toilet, washrooms and quarters clean on ship's time.

"Stewards' Department Working Rules

"Section 1. The chief steward shall be recognized as the head of the Stewards' Department and shall direct the work of the personnel employed therein. The

of libellants, would not give libellants the legal right to leave the ship, when respondent had, prior to the time they left, offered to allow them and all seamen similarly situated to continue work under the Agreement.

Judgment for respondent.

steward likewise may do any work in the preparation of meals or other work which he may deem necessary for the efficient operation of the department.

"Section 2. The hours of the Stewards' Department shall be eight (8) hours each day in a spread between 6:15 A.M. and 6:15 P.M. except for the utility man. No overtime shall be paid for the preparation and serving of regular meals and cleaning of quarters, galley and messrooms, within hours specified.

"Section 3. Normal manning scale of stewards' department shall be as follows:—

| Number of Crew Excluding Stewards' Department | Manning Scale Stewards' Department |
|---|---|
| 23 to 28 inclusive | 6 |
| 29 to 36 inclusive | 7 |

"(a) On vessels having a crew of 37 or more exclusive of Stewards' Department, additional members of the Stewards' Department shall be added on the basis of one (1) additional man for five (5) or less of additional crew or passengers carried.

"(b) One employee of the Stewards' Department not engaged in the preparation and serving of food shall be rated as utility man. Hours of work shall be eight hours in a spread between 5:00 A.M. and 5:00 P.M. His duties shall consist of lighting the galley fires, cleaning the toilets and bathrooms, except those of firemen and sailors, and performing general cleaning work under the supervision of the chief steward.

"Section 4. Members of the Stewards' Department shall not be required to prepare and serve other than the three regular meals and prepare regular night lunches for the watches. If, on the orders of the Master or commanding officer lunches are served in addition to the three regular meals already provided for, one hour's overtime shall be paid to each man actually engaged in the preparing and serving of such lunches, provided, however, that where meals are served to longshoremen and Panama Canal laborers on board any vessels, the sum of thirty cents for each person served shall be equally distributed to those actually engaged in this work, in lieu of overtime.

"Section 5. In port all work performed on Saturday afternoon, Sunday and holidays shall be paid for at the regular overtime rate. If employees in the Stewards' Department are required to work Saturday afternoon in port they shall not receive in excess of four hour's overtime pay unless the assignment requires work in addition to their regular duties specified in Section 2.

"Section 6. In port all refuse compartments shall be located convenient to the galley.

"Section 7. No member of the Stewards' Department shall be required to serve coffee or meals in the engine room, nor shall they be required to enter the engine room at any time. Upon order of the Master they may be required to serve coffee or meals on the bridge.

"Section 8. When members of the Stewards' Department are required to stow stores away requiring more than fifteen minutes, they shall be paid overtime in addition to their regular wages at the overtime rate. Members of the Stewards' Department shall not be required to carry stores or linen from shore to vessel or from vessel to shore.

"Section 9. Members of the Stewards' Department shall not be required to do chipping, scraping or painting. However the utility man may be required to 'touch up' paint when necessary.

"Section 10. For vessels running coastwise on arrival at discharge port, sufficient bread, if available, will be supplied for a forty-eight hour period.

"Article IX

"Section 1. Ratification of this agreement by the unlicensed personnel employed on the vessels of the Company shall be conclusive that the agreement is binding on all such unlicensed personnel and is within the authorization of the Constitution of the Union.

"Section 2. In the event that any provision of this contract shall at any time be declared invalid by any court of competent jurisdiction, such decision shall not invalidate the entire agreement, it being the express intention of the parties hereto that all other provisions not so declared invalid, shall remain in full force and effect."