George GRIVAS, Zois Trilivas, Pavlos Asvastos, Andreas Theodossis, Panagiotis Mparmpousis, Ioannis Chamkothoris, Stavros Frangeskatos, Anastasios Stranzakis, Manolis Mersinias and Christos Kalsatidis, Libelants,

v.

ALIANZA COMPANIA ARMADORA S.A., Trans World Marine Transport Corporation, Ioannis Bielis, John Doe and THE S.S. NIKI, her engines, tackle, boilers, etc., Respondents.

United States District Court
S. D. New York.
April 25, 1957.

Lebovici & Safir, New York City, for libelants, Isaac Salem, New York City, of counsel.

Frederick H. Cunningham, New York City, for respondents, Victor S. Cichanowicz, New York City, of counsel.

DAWSON, District Judge.

This is an action brought by a group of Greek seamen who were hired in New York as part of a crew of a ship then on the West Coast. The ship had a Liberian registry but was owned by a Panamanian corporation. After the crew boarded the vessel on the West Coast various arguments and disputes arose between the crew and the officers, with the result that some weeks thereafter the crew went on a sit-down strike and refused to work and refused to leave the ship. As a result the striking crew members were removed by the police at the request of the master and were taken into custody by the United States immigration authorities at Portland, Oregon and thereafter deported.

In this action the libelants seek recovery against the respondents for six items, as follows:

1. Wages from June 18, 1952 to June 23, 1952.

2. Vacation pay.

3. Overtime pay.

4. Damages for alleged unjustified discharge.

5. Compensation for special work done by certain of the libelants in cleaning the hold of the vessel; and

6. Damages for alleged false arrest and abandonment of libelants in Portland, Oregon.

The Court finds the following facts:

(1) The libelants were each engaged by duly authorized agents of Alianza Compania Armadora, S.A. for services aboard the S.S. Niki which is owned by the corporate respondent, a Panamanian corporation.

(2) Engagement of libelants for service on the ship was made orally; libelants were informed of the amount of wages that would be paid to them, that the ship was then at Victoria, B. C., and

that they would be transported to that port at the ship's expense.

(3) Each libelant submitted to a physical examination on June 18, 1952 and was accepted for service, and turned over his seaman's book to a representative of the vessel.

(4) Libelants left New York by airplane on June 23, 1952 for the West Coast and boarded the vessel at Victoria, B. C. on June 26, 1952; transportation expense was paid by respondents.

(5) Libelants were paid the agreed wages from the time they left New York on June 23, 1952, but were paid no wages for the period from June 18, 1952 (date of passing physical examination) to June 23, 1952.

(6) At the time libelants were hired it was agreed that the deck crew would receive between them the sum of $200, in addition to their wages, for cleaning the hold of the vessel; when the crew boarded the ship the deck crew was put to work cleaning the hold; thereafter the master advised the members of the deck crew that they would not be paid $200 extra for cleaning the hold but would be paid overtime at the rate of 50¢ an hour and thereupon the crew ceased working in the hold and refused to clean the hold; as a result the deck crew did not clean the hold or do any substantial amount of work in cleaning the hold of the vessel; and the master hired shoreside laborers to do the job.

(7) The vessel went from Victoria, B. C. to Vancouver, B. C., arriving there on June 28, 1952, and when it arrived there the Liberian flag was raised.

(8) Commencing June 29, 1952 the seamen were called in one at a time to sign the Ship's Articles and each of the libelants thereafter signed the Ship's Articles; the Ship's Articles were written in both English and Greek but few, if any of the libelants can read and none read the Articles before they signed them.

(9) The Ship's Articles provided among other things:

(a) That the vessel would proceed from Vancouver, B. C. to South Africa and to such other ports as the master might direct and back to a final port of discharge in the United States, and that the voyage was to be of indefinite duration;

(b) That the ship was a Liberian ship;

(c) That the master might terminate the agreement for the following causes:

"Insubordination * * * quarreling or fighting aboard the ship * * * unfitness to perform the tasks and fulfill the duties of his post, * * * and it is further mutually understood and agreed that because of the nature of the employment it is left entirely to the sound judgment and discretion of the master alone to determine what constitutes the above enumerated causes."

(d) That the crew could be discharged other than where hired so long as the port was in the United States:

"If the seaman requests his discharge or deserts the ship in a port outside of the United States no obligation or [sic] repatriation exists. Upon being discharged in any United States port the seaman is not entitled to any transportation expenses."

(10) On July 15, 1952 a fight developed between the libelant Grivas and a messman named Xagoraris which resulted in both of them being taken by State Police before a Justice of the Peace. On July 21, 1952, while the ship was at Coos Bay, Oregon, the theft of thirty-four gallons of paint was discovered. This was reported to the police. Libelant Grivas was the watchman on duty at the time and the master reported that libelant Trilivas was the suspect.

(11) The ship went from Coos Bay, Oregon, to Portland, Oregon, where it arrived on July 26, 1952. There the master discharged the libelants Grivas and Trilivas and also a seaman named

Konpoyiorgas. These men refused to leave the ship although they did no further work on it after being discharged.

(12) On July 29, 1952, the deck crew, including all the libelants and some of the engine room crew, went on strike; the three men who had been discharged picketed the ship, carrying "on strike" placards, and the gang of stevedores then working on the ship left the vessel as a result thereof. Some one of the crew turned off the steam, the winches stopped and several heavy slings of lumber fell down. The captain called the police. The police gave orders to the three discharged seamen to leave the vessel and when they did not voluntarily leave the police put them off. The captain told the rest of the crew to go back to work or leave the vessel. These other seamen demanded that the Articles should be revised so as to provide that the master could not discharge a crew member without paying his transportation back to New York. When the master refused to accede to this demand the balance of the libelants refused to leave the vessel or to go back to work. The captain again called the police and they put the strikers off the vessel. The next morning the stevedores returned to work and the vessel continued to load. Thereafter a new crew of seamen came on from New York.

(13) Each of libelants received wages through the date of his discharge but did not receive any wages for the period from June 18, 1952 to June 23, 1952, nor any transportation expenses back to New York.

(14) Each of the libelants was taken into custody by the Immigration and Naturalization Service in Portland, Oregon, was transported by air to Ellis Island, New York, and thereafter deported from the United States.

■ Libelants' first claim is for wages for the interval from June 18, 1952 to June 23, 1952. During this period they had already been engaged and were awaiting transportation to the West Coast. On June 18 libelants were given a physical examination and were re-

quired to surrender their seamen's papers to respondent who retained custody of these documents. To decide the issue raised by this claim it is necessary to determine if libelants' employment dates from June 18 or 23. As to this provision of the oral agreement reached by the parties there was sharp dispute in the testimony. As proved by libelants the contract provided for their employment and compensation from the date of their engagement. Certainly the conduct of the parties during the period prior to June 23 does not conflict with the existence of such an agreement. While the issue is not free of doubt, the Court concludes that by the terms of the oral agreement made by the parties on June 18, libelants' compensation was to begin on that date. Accordingly each libelant is entitled to his wages for the period from June 18 to June 23, 1952.

Libelants claim they are also entitled to overtime pay and special pay for work on Sundays and holidays, as provided for in the Panama Labor Code, and bring this suit for such amounts, based upon provisions of that Code. Libelants contend that the Court must consider the S.S. Niki as a Panamanian vessel and must determine the rights of the crew members according to the provisions of the Panama Labor Code because the vessel was owned and operated by a Panamanian corporation. Libelants presented in evidence, as Exhibit 10-A, an English translation of the Panama Labor Code.

The Court has found that the vessel was indeed owned by a Panama corporation but that it flew the Liberian flag and that the Ship's Articles referred to it as a Liberian ship. Is the Court, therefore, to determine the wages of the seamen under the Panama law or under the Liberian law?

■ The Panama Labor Code does not by its terms apply to ships registered in another country and flying the flag of another country, merely because they are owned by a Panamanian corporation. Panama might, of course, impose requirements on Panamanian corporations

requiring them to comply with the provisions of the Panama Labor Code, but there has been no evidence offered to the Court that would establish that Panama has imposed such requirements or that the Labor Code applied to a ship of foreign registry merely because it is owned by a Panamanian corporation. Furthermore it appears from Article 1080 of the Commercial Code of the Republic of Panama that the fact that a ship is owned by a Panamanian corporation does not make the ship a Panamanian vessel unless it "be registered and enrolled as such and their owners submit expressly to the legal provisions of the Republic concerning navigation * * *." See Berguido, The Rights of a Seaman on a Ship Under Panamanian Registry, 19 Temp.L.Q. 458, 460. The Court concludes that the fact that the vessel was owned by a Panamanian corporation did not in and of itself entitle the crew to the benefits of the Panama Labor Code.

Libelants may contend, however, that their engagement was predicated on an understanding that they would get the benefits of the Panama Labor Code, including overtime pay, vacation pay and special pay for work done on Sundays. There was no competent proof that the parties so agreed.

The Court further concludes that even if there had been such an oral agreement libelants would not have been entitled to the items claimed for (1) vacation pay, (2) overtime pay or (3) extra compensation for cleaning the hold of the vessel, for the following reasons:

### Vacation Pay

Under the Panamanian Labor Code paid vacations are to be provided by employers on the following basis:

"Thirty days for each continuous eleven months of work, at the rate of one day for each eleven consecutive days of work at the service of his employer * * *." Art. 170.

The Court construes this provision to mean that a worker is not entitled to vacation pay until he has worked for the employer for a continuous period of eleven months, and that if he has completed this period he then would be entitled to vacation pay of at least thirty days of paid vacation or such additional amount as would be paid at the rate of one day for each eleven consecutive days of work. To construe this provision otherwise would mean that the statute would provide for one day of rest for every eleven days of work, which does not seem consistent with the concept of "vacation pay" or with the other articles of the Code, such as the one which provides:

"The employer shall fix the period during which the worker may enjoy his vacations so as to meet as best as possible the interests of the firm and of the worker * * *." Art. 174.

Since none of the libelants worked for the respondent for a continuous period of eleven months the Court concludes that even under the Panamanian Labor Code they would not be entitled to vacation pay.

### Overtime Pay

The libelants have not established that even under the Panamanian Labor Code they are entitled to any additional amount for overtime pay. Each of the libelants, when he signed off the vessel, received a cash payment which he accepted as full payment of his wages and overtime pay. On these receipts the overtime payments were specifically allocated to a specific number of overtime hours. At the time these receipts were signed the libelants had already been discharged. They signed the receipts with reservations as to their rights to claim transportation expenses back to New York as well as wages after the time of their discharge, i. e. after July 26. In view of the animus then existing between the seamen and the respondent it is reasonable to assume that if any of the libelants thought they were entitled to any overtime they would have made a similar reservation as to such overtime. No such reservation was made

by any of the libelants. None of the libelants testified in the action as to any overtime work by them except libelant Stranzakis, who testified by deposition. This witness stated that he got paid at overtime rates for all overtime that he worked.

■ Libelants urged that the wage records show that certain of the libelants worked on Sundays, and that therefore they are entitled to time and a quarter for work done on that day. But none of the libelants testified as to how much time he worked on Sunday, nor do the wage records show that. The witness Stranzakis testified that he did not work on Sundays when the vessel was in port and that some of the crew did not work on Sundays even when the vessel was at sea. In the absence of definite proof as to the Sundays worked by the libelants, the libelants have failed to meet the burden of proof of establishing that there is any money owing to them, or to any of them, for time worked on Sunday.

*Cleaning the Hold of the Vessel*

■ Likewise libelants have not established that they are entitled to extra compensation for cleaning the hold of the vessel. There is undisputed testimony that the sum to be paid for cleaning the hold was a figure of $200, to be divided between the deck crew, for the entire job of cleaning the hold. There is testimony, also undisputed, that the deck crew did not clean the hold because of an argument which ensued shortly after the work had been started, and that as a consequence the ship had to hire shore-side workers to clean the hold of the vessel. If there was a contract to pay the deck workers $200 additional for cleaning the hold of the vessel the libelants have not sustained the burden of proof. Libelants by their own admission walked off the job. The evidence fails to justify this failure to perform. Ac-

cordingly, libelants' claim cannot be sustained.

■ The next claim of libelants is one for damages for alleged unjustifiable discharge. It was admitted that libelants went on a sit-down strike, refused to work and refused to leave the ship. Even if the men had a justifiable grievance these action on their part were sufficient to warrant immediate discharge, and hence libelants have established no cause of action for such discharge. Korthinos v. Niarchos, 4 Cir., 175 F.2d 730 certiorari denied, 1949, 338 U.S. 894, 70 S.Ct. 241, 94 L.Ed. 550.[1]

■ Justifiable complaints of seamen are entitled to prompt and considerate treatment in the courts, but this does not mean that seamen may take the law into their own hands and may refuse to obey the orders of the master or refuse to work the ship. Because of the unique nature of the maritime service and the danger to the public that might result from the organized refusal of seamen to perform their duties, seamen have no right to strike when a vessel is away from its home port:

> "The right to strike does not carry with it the right to deprive another person of the possession of his property * * * nor the right to disobey lawful orders of the master when the vessel is away from its home port." Korthinos v. Niarchos, supra, 175 F.2d at page 732.

The Supreme Court has recognized that while seamen are wards of the court they nonetheless owe a rigorous duty to their ship:

> "Ever since men have gone to sea, the relationship of master to seaman has been entirely different from that of employer to employee on land. The lives of passengers and crew as well as the safety of ship and cargo, are entrusted to the master's

1. A contrary point of view has been expressed. See Rothschild, The Legal Implications of a Strike by Seamen, 45 Yale L.J. 1181 (1936); Note, 38 Colum.L.Rev. 1294 (1938).

care. Every one and everything depend on him. He must command and the crew must obey. Authority cannot be divided. These are actualities which the law has always recognized." Southern Steamship Co. v. N. L. R. B., 1942, 316 U.S. 31, 38, 62 S.Ct. 886, 890, 86 L.Ed. 1246. Thus it has been held that where a seamen left a ship because of a strike before completion of a voyage, this act consituted "desertion" and he was not entitled to accrued but unpaid wages. See, e. g., Madden v. Lykes Bros. Ripley S.S. Co., 5 Cir., 110 F.2d 968 certiorari denied, 1940, 311 U.S. 690, 61 S.Ct. 69, 85 L.Ed. 446; Barfield v. Standard Oil Co. of New Jersey, 1939, 172 Misc. 95, 14 N.Y.S.2d 627; Clayton v. Standard Oil Co. of New Jersey, D.C.S.D. Tex.1941, 42 F.Supp. 734, 735.

Reviewing the applicable case law leads to the conclusion that libelants' claim for wrongful discharge must be dismissed. The strikers terminated their right to employment. Under the circumstances, the master was privileged to discharge them.

Libelants also seek "damages for unlawful arrest and detention visited upon libelants and each of them by respondents, their agents, servants and employees." Libelants describe this relief as being in the nature of damages for false arrest arising out of the fact that the master had the police remove the libelants from the vessel, with the consequence that they were later taken into custody by the immigration authorities and deported.

It appears clear from the evidence that all the master did was to ask the police to remove the men from the vessel. Under the circumstances this would not amount to false arrest. The men had refused to work; they were discharged but nevertheless refused to leave the vessel. The master had a right, in such a situation, to have the police remove the men from the vessel and such action does not constitute false arrest. See Mavromatis v. United Greek Shipowners Corp., 1 Cir., 1950, 179 F.2d 310.[2]

The detention of libelants by the immigration authorities was a consequence of libelants' own actions. When libelants, by their own actions, refused to work and refused to leave the ship and were then put ashore by the police, it was the libelants' responsibility to regularize their immigration status. They could have shipped out on another ship. The testimony of libelant Stranzakis was that two of the seamen, who had been removed from the ship, did sail out on another ship from Portland, Oregon, and hence were not taken into custody by the immigration authorities. It likewise appears from his testimony that the men got railroad tickets, presumably to New York, where it might have been easier for them to ship out on another vessel, but "that when we were arrested in Portland at the Immigration Office, Kalsatidis had all the railroad tickets and when he was left free to go he took the tickets with him and left us without any tickets and we haven't seen him since." It can hardly be deemed the fault of the respondent that one of the seamen (who is a libelant in this action) apparently absconded with the railroad tickets of libelants with the result that they were left stranded in Portland and taken into custody by the immigration authorities.

The Court concludes that each libelant is entitled to wages paid at his regular rate for the period from June 18, 1952 to June 23, 1952, but that libelants have failed to sustain any cause of action for any other relief. Let a decree be entered accordingly.

This opinion shall constitute the findings of fact and conclusions of law of the Court.

2. It may be of interest that the action in this case was also brought by a group of Greek seamen who served on the S.S. Niki. These seamen were discharged for insubordination at Portland, Maine, but refused to leave the ship, whereupon it became necessary for the captain to have them forcibly removed by the police. The court held that this created no cause of action for false arrest.